No. 33,187

MARGARET PAGAN, *Appellant*, v. FRANK O. LOWDEN, JAMES E. GORMAN and JOSEPH B. FLEMING, as Trustees of the Chicago, Rock Island & Pacific Railway Company, *Appellees*.

(66 P. 2d 567)

Opinion filed April 10, 1937.

*John J. McCurdy*, of Lincoln, *Randal C. Harvey* and *Paul L. Harvey*, both of Topeka, for the appellant.

*Luther Burns* and *J. E. DuMars*, both of Topeka, for the appellees.

The opinion of the court was delivered by

SMITH, J.: This was an action to recover for the death of the husband of plaintiff, who was killed when his automobile was

struck at a grade crossing by a train operated by defendant. Judgment was for defendant, sustaining a demurrer to the evidence of plaintiff. · Plaintiff appeals.

The tragedy happened on March 20, 1935. On that day there was a dust storm. Maximum visibility was reduced to between 300 and 750 feet. Deceased was struck and killed by a westbound passenger train of defendant at the crossing of federal highway No. 10 and the Rock Island tracks immediately adjacent to the city of Maple Hill, about 200 feet east of the railway station.

The highway is an extension of Main street of the city. Proceeding south out of the city, along its main street, just before reaching the crossing the highway begins to curve slightly to the east. The crossing is made up of four tracks. Going south on the highway the first track encountered is a house track, which is 51 feet from the westbound main tracks. Proceeding from this track to the main tracks the highway bears slightly to the east. From the house track to the main tracks the highway rises about 2 feet. The eastbound main track is 19 feet beyond the westbound main track upon approximately the same level. From this eastbound main track the highway drops about 6 inches to cross a siding track about 16 feet away. The highway then drops very abruptly. During all the distance occupied by the tracks mentioned the highway bears slightly to the east. After it crosses the side track spoken of it turns almost at right angles to the east. On the day of the tragedy there was a string of five boxcars standing on the house track east of the highway. The west end of the car that was farthest to the west was about 21 feet east of the highway.

Having made the physical features of the crossing plain, since this case comes to us on an appeal from an order sustaining a demurrer to the evidence of plaintiff, we shall take note of what the evidence showed happened on the evening of the tragedy.

The petition described the crossing and the death of deceased, and pleaded that defendant was negligent in operating· its train at a dangerous rate of speed over an extensively traveled crossing at which the view from both directions was obstructed by buildings and cars, during a severe dust storm, and in maintaining an unsafe crossing, as set out in the petition, in violation of G. S. 1935, 66-227, and in failing to take extra precautions to warn persons on the highway of the approach of such train under the conditions prevailing at the time.

The defendant answered with a general denial and that the county commissioners, together with officials of the defendant, had inspected the crossing, and found that changes in it were unnecessary and so advised defendant.

The answer further alleged that the death of deceased was caused by his own negligence.

The first witness for plaintiff, as to what happened, testified that he was on the north side of five boxcars, which stood on the house track to the east of the highway, with the westernmost car about 21 feet from the east line of the highway. He testified as to physical conditions of the crossing about which there does not seem to be much dispute, and then testified that he had driven over the crossing many times in a Chevrolet car, and on approaching the crossing you could not judge your position within 3 or 4 feet on account of the rise that has been spoken of.

He testified that on the day of the accident he saw the train coming when it was about to the stockyards, but the light was dim on account of the dust; that he was facing the direction from which the train was coming, and, in his judgment, the train was going about 60 miles an hour; that he saw deceased cross the house track and he was going between 15 and 20 miles an hour. On cross-examination he testified that the stockyards might be 550 feet from the highway; that he heard the rumble of the train and heard it whistle; that he heard the train, started to get in his truck and back up and saw deceased coming down the street at a slow rate of speed, "and he went by me" after the train had whistled. From where he was standing he could see the train as far away as the stockyards; that the only things to obstruct the view of deceased as he approached the house track were the five boxcars; that after he passed the boxcars there was nothing to obstruct deceased's view but a battery box and a rack to hang mail sacks on; that from a point 30 feet north of the main line on a clear day you could see a mile away; that on the day in question a person could see ahead 300 or 400 feet; that he saw the train coming down by the stockyards because he was looking for it; that he examined the car after the wreck and found the gears to be in reverse.

The next witness for plaintiff testified that he had driven over the crossing; that on account of the slope in the highway he could not judge the distance in front of him as well as if the car had been on the level; that on approaching this particular crossing you would

have to look to the east and west for trains; "that if a person were driving up the grade and were on the lookout for trains as they approached this crossing if they slowed down their car would be on an incline"; that for 3 or 4 feet he could not tell how far he was from the track. On cross-examination he testified that he could see automobiles coming from the opposite direction after they turned the corner.

The next witness for plaintiff testified that if a stop were made just before crossing the tracks it would be necessary to hold the car with brakes to keep it from going back; and that when a car is put into reverse at an idling speed it will kill the engine.

The next witness for plaintiff testified that he was looking out the east window of the depot and saw the train coming; that he saw the car in which deceased was riding as it was crossing the house track; that he first saw the train between the stockyards and the crossing; that at the time the car was hit by the train the front wheels of the car were just over the north rail of the westbound main tracks; that it looked as if the car had just stopped when the train hit it; that in his judgment the train was going about 55 or 60 miles an hour and the automobile was going about 15 or 20 when it crossed the house track.

The next witness for plaintiff testified that he observed the dust storm on the day in question about 4:30 o'clock; he could see four or five hundred feet; that after you cross the house track there is a gradual incline up to the westbound main track.

The next witness for plaintiff testified that he saw deceased drive by, going about 15 or 20 miles an hour; that he heard the train whistle down the track; that he watched deceased as he passed the end of the boxcars, but the dust made it very dim; that he did not see the train until it came from behind the box cars and struck deceased. On cross-examination he testified that he heard the train whistle down the track and wondered if they would meet; that it was about 740 feet from where he stood as deceased passed him to the main-line track. On redirect examination he testified that there was a place north of the house track where a traveler could see way down the track; that at the crossing one has all he can do to watch the traffic from the other way; that at the place north of the house track a traveler can get a good view down the track in ordinary weather, but one could not see very much on a day like the one in question; that when one gets down to the crossing he has enough

to do to watch the road ahead, on account of the fact that the road curves to the east, and one cannot see cars coming until they start coming up out of that curve, because it is low there; that the difficulty is that it both drops and curves at the same time.

The next witness for the plaintiff testified that he was signal maintainer for the company; that he was standing outside the depot when the collision occurred; that deceased stopped with his front wheels right on the north rail of the westbound main track. On cross-examination he testified that he first saw the automobile north of the house track about 100 feet; that he saw the train at that time and "hollered" at the man; that deceased was traveling from 8 to 15 miles an hour until he got right up to the main track and then he stopped suddenly; that he saw the headlight of the train some place below the stockyards and heard it whistling for the crossing at Willard, 4 miles away; that he "hollered" at the deceased once and waved at him.

The demurrer of defendant to this evidence was sustained. Defendant argues here that this evidence shows that the condition of the crossing and the surroundings in no way contributed to the accident; that defendants were not negligent in the operation of the train; that the atmospheric conditions prevailing at the time were not the cause of the accident; and that the negligence of the deceased was the sole and proximate cause of the accident.

Plaintiff argues that G. S. 1935, 66-227, applies to this case. That section provides, in part, as follows:

"It is hereby made the duty of every person or corporation owning or operating any railroad crossed by a public highway to make, and keep in good repair, good and sufficient crossings for such road over their tracks, including all the grading, bridges, ditches, and culverts that may be necessary to make a safe crossing as hereinafter provided. Said crossing shall not be less than twenty-four feet in width on county roads or twenty feet in width on township roads, and shall be on the same grade as the track for thirty feet on each side of the center of said track, unless the board of county commissioners shall find the same to be unnecessary, and the approaches thereto shall not exceed a six-percent grade . . ."

Plaintiff points out that this crossing did not meet the requirements of the above section on account of the rise in the grade of the highway between the house track and the westbound main track. There can be no doubt that this crossing did not comply with the statute. Defendant meets that contention in this court by pointing out the provisions of G. S. 1935, 68-414, which was enacted in 1929.

In that section the highway commission was given the power and authority to compel all railroad companies in this state to construct, improve, reconstruct or maintain in a manner to be approved by the state highway commission grade crossings where the lines of the railroad companies intersect state highways, when in the judgment of the state highway commission such grade crossings are necessary for the proper construction of the state highway system for the safety of the general public. Defendant argues that by the enactment of the above statute the provisions of G. S. 1935, 66-227, were repealed insofar as they applied to grade crossings on the state highway system, and that since the highway commission had not ordered defendant to reconstruct the crossing in question it must have met with the approval of the commission. This argument is not good. The legislature enacted G. S. 1935, 68-414, with the end in view of providing for a long-time highway construction program. It was not contemplated that the railroads of the state would reconstruct all their grade crossings the first year after the law went into effect nor that the highway commission would do all the construction work necessary on new grade crossings in the same length of time. To do so would have been financially and physically out of the question, both for the companies and the commission. In the meantime, until the highway commission does undertake to order some change in a particular crossing, G. S. 1935, 66-227, with its provisions as to grade crossings is in effect.

The fact that the crossing did not comply with the provisions of G. S. 1935, 66-227, does not by itself render defendant liable. It must appear that this condition was the cause of the injury. In this case there is evidence that the train was in sight when deceased crossed the house track. He was then 51 feet away from a place of peril. The argument that the rise in the highway between this point and the point where the car was struck was the cause of the collision is that it threw the car into such a position that the driver could not tell within 4 or 5 feet what his position was with reference to the railroad track. If the situation had been such that the driver had not been able to realize that he was approaching a railroad track until he was within 3 or 4 feet of it this argument would be persuasive. The facts are, however, that giving the driver the benefit of every reasonable presumption to be had from the evidence, he could have seen the train when he was halfway between the house track

and the track where his car was struck. At that time the train was somewhere between the stockyards 500 or 600 feet away and the crossing. The evidence is that it was visible from the stockyards on. Had deceased glanced down the track in the direction from which the train was coming when he was 25 feet away from the track he would undoubtedly have seen the train coming. The fact that his front wheels had barely come to a stop on the first rail when his car was struck shows that he must not have been looking just before he drove onto the track. Had he looked he surely would have seen the train coming in that short a time, even though it was going 60 miles an hour. What must have happened is that he drove ahead and onto the tracks without keeping the lookout that an ordinarily prudent man should have kept under the circumstances. There was ample time between his crossing the house track and his reaching a point even 3 or 4 feet from the main track for him to have stopped his car and waited for the train to go by. There was evidence of two or three witnesses that the train had whistled even before deceased passed the house track. The reasons that have been given as to why the collision was not caused by the condition also force us to the conclusion that deceased was guilty of such negligence as to bar the plaintiff from recovery. There was evidence that the train had whistled. The fact that the boxcars were standing on the house track is not such a circumstance as would make the defendant liable, for the reason that after deceased had passed the place where the boxcars obscured his vision to the east he still had 25 feet in which to take stock of his surroundings, and stop. It would add but little to this opinion to include authorities where one injured at a grade crossing has been held guilty of contributory negligence. The conclusion reached here, however, is upheld in *Bunton v. Railway Co.*, 100 Kan. 165, 163 Pac. 801; also, in *Wehe v. Railway Co.*, 97 Kan. 794, 156 Pac. 762, *Reader v. Railway Co.*, 112 Kan. 402, 210 Pac. 1112, and others.

The judgment of the trial court is affirmed.

HARVEY, J., not sitting.